## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN GREAT LAKES PORTS ASSOCIATION<br>   700 12th Street, NW, Suite 700<br>   Washington, DC 20005,<br><br>BROCHART KB<br>   Trappvagen 5<br>   Sollentuna, 191 35 Sweden,<br><br>CANFORNAV INC.<br>   800 Rene-Levesque Blvd West<br>   Suite 2300<br>   Montreal, Quebec H3B 1X9 Canada,<br><br>FEDNAV INTERNATIONAL LTD.<br>   1000 de La Gauchetière Street West<br>   Suite 3500<br>   Montreal, Quebec  H3B 4W5 Canada,<br><br>POLSKA ZEGLUGA MORSKA P.P.<br>   Plac Rodła 8<br>   70-419 Szczecin, Poland,<br><br>SHIPPING FEDERATION OF CANADA<br>   300 St. Sacrement Street, Suite 326<br>   Montreal, Quebec H2Y 1X4 Canada,<br><br>SPLIETHOFF TRANSPORT BV<br>   Radarweg 36<br>   1042 AA Amsterdam, The Netherlands,<br><br>UNITED STATES GREAT LAKES SHIPPING ASSOCIATION<br>   7714 Woodstar Lane<br>   Concord Township, OH 44077-8993,<br><br>and<br><br>WAGENBORG SHIPPING BV<br>   Marktstraat 10<br>   9934 CK Delfzijl, The Netherlands,<br><br>    Plaintiffs, | Civil Action No. 1:18-cv-2650 |

v.

ADMIRAL KARL SCHULTZ, in his official
Capacity as Commandant, United States
Coast Guard
    2703 Martin Luther King Avenue SE
    Washington, DC 20593-7000,

    and

UNITED STATES COAST GUARD
    2703 Martin Luther King Avenue SE
    Washington, DC 20593-7000,

    Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs American Great Lakes Ports Association, Brochart KB, Canfornav Inc., Fednav International Ltd., Polska Zegluga Morska P.P., Shipping Federation of Canada, Spliethoff Transport BV, United States Great Lakes Shipping Association, and Wagenborg Shipping BV (collectively, "Plaintiffs"), by counsel, bring this Complaint seeking review of actions by the United States Coast Guard ("Coast Guard or "the Agency") establishing Great Lakes pilotage rates for the 2018 navigation season.

## NATURE OF THE ACTION

1.      Plaintiffs seek review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-706, of a final rule promulgated by the Coast Guard, setting pilotage rates on the Great Lakes effective July 5, 2018. *Great Lakes Pilotage Rates – 2018 Annual Review and Revisions to Methodology*, 83 Fed. Reg. 26,162 (June 5, 2018) (the "Final Rule").

2.      The Coast Guard regulates certain aspects of marine pilotage, including pilotage rates paid by vessel owners and operators in the Great Lakes. *See* Great Lakes Pilotage Act of

1960, 46 U.S.C. §§ 9301-9308 (the "Act").  From 2006 to 2017, pilotage rates have increased

substantially.  Much of this increase has occurred in the last four annual navigation seasons.

3.      The Final Rule establishes significantly increased pilotage rates on vessels using

U.S. pilots while transiting the Great Lakes in the 2018 navigation season.

4.      These rates became effective on July 5, 2018 and will remain in effect until

superseded by new rates established pursuant to subsequent Coast Guard rulemaking

proceedings.

5.      Certain aspects of the Final Rule violate requirements of the APA. The Coast

Guard set rates in the Final Rule based on defects in its cost and revenue calculations and

supported its decisions with faulty or unexplained logic. The Coast Guard's action is arbitrary

and capricious and an abuse of discretion in violation of the APA.

6.      For the reasons set forth herein, Plaintiffs ask that the Court declare unlawful

and vacate the Coast Guard's Final Rule, mandate that the Coast Guard revise its calculations

of 2018 pilotage rates to establish 2018 Great Lakes pilotage rates for the duration of the

effective period of the 2018 rates, and remand the rulemaking to the Coast Guard for further

development and revision consistent with the Court's rulings herein.

## PARTIES

7.      Plaintiff American Great Lakes Ports Association ("AGLPA") is a Washington,

D.C., not-for-profit association whose mission is, among other things, to represent the interests

of commercial ports and port users on the United States side of the Great Lakes.  AGLPA

member ports are served by ocean-going vessel operators subject to Great Lakes pilotage

regulations.  Great Lakes ports are dependent on cost-effective waterborne commerce and,

therefore, have a direct interest in a safe, efficient, reliable, and rationally priced pilotage system.

8.      Plaintiff Brochart KB is a Swedish based bulk and general cargo shipping company operating between Great Lakes and overseas ports. Brochart KB operates in the Great Lakes region and pays for pilotage services subject to the Final Rule.

9.      Plaintiff Canfornav Inc. is an international ocean carrier with a fleet of over 40 vessels. Canfornav, Inc. serves the St. Lawrence River and Great Lakes, and is one of the largest ocean-going carriers serving that region. Canfornav Inc. pays for pilotage services subject to the Final Rule.

10.     Plaintiff Fednav International Ltd. ("Fednav") is Canada's largest ocean-going dry-bulk shipowning and chartering group. Fednav operates vessels in the Great Lakes region and pays for pilotage services subject to the Final Rule.

11.     Plaintiff Polska Zegluga Morska P.P. ("Polsteam") is a Polish state enterprise that manages a fleet of vessels. Polsteam operates vessels in the Great Lakes region and pays for pilotage services subject to the Final Rule.

12.     Plaintiff Shipping Federation of Canada ("SFC") is a not-for-profit Canadian association created by an act of Canada's parliament in 1903. SFC's mission is, among other things, to promote and protect the interests of the owners, operators, and agents of vessels involved in international trade, including trade on the St. Lawrence Seaway and Great Lakes. SFC has over 70 member companies from the United States, Canada, and other maritime nations representing over 250 ocean shipping companies. Members of SFC, including the vessel owners and operators herein that are Plaintiffs, pay for pilotage services subject to the Final Rule.

13.     Plaintiff Spliethoff Transport BV ("Spliethoff") is an independent shipping company based in the Netherlands. Spliethoff operates in the Great Lakes region and pays for pilotage services subject to the Final Rule.

14.     Plaintiff United States Great Lakes Shipping Association ("USGLSA") is a not-for-profit association whose mission is, among other things, to protect the interests of its vessel agent members located at major ports throughout the Great Lakes.  USGLSA agents serve the international flag vessel fleet entering the Great Lakes and calling at Great Lakes ports. Members of USGLSA are the commercial maritime entities that directly arrange for Great Lakes pilotage services. Consequently, safe, reliable, and rationally priced pilotage is of vital concern to both USGLSA and its members.

15.     Plaintiff Wagenborg Shipping BV is an international shipping company. Wagenborg Shipping BV vessels operate in the Great Lakes region and pay for pilotage services subject to the Final Rule.[1]

16.     Defendant Coast Guard is an agency of the United States within the Department of Homeland Security.  The Coast Guard is, and was at all times and for the subject matters relevant hereto, an administrative agency of the United States Government subject to the APA with regard to its rulemaking actions.  *See* 5 U.S.C. § 551.  The Coast Guard is headquartered at 2703 Martin Luther King Avenue SE, Washington, DC 20593.

**JURISDICTION AND VENUE**

17.     This action arises under the APA.  This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1337, 1361, and 1651.  This Court is authorized to

---

[1] Plaintiffs Brochart, Canfornav, Fednav, Polsteam, Spliethoff, and Wagenborg are collectively referred to in this Complaint as "shipowners" or "ratepayers."

issue the non-monetary relief sought herein pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and the APA, 5 U.S.C. §§ 702, 705, 706.

18.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against officers and agencies of the United States.  Defendant United States Coast Guard is found in this District, Defendant Karl Schultz performs his official duties in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

**ALLEGATIONS COMMON TO ALL CLAIMS**

### A.  Regulatory Background

19.     The Act requires foreign oceangoing vessels on the Great Lakes to use U.S. or Canadian pilots while transiting the waters of the St. Lawrence Seaway and the Great Lakes system.  *See* 46 U.S.C. § 9302(a)(1).  The Coast Guard is required by the Act to annually review the rates paid to those pilots and to adjust the rates based on that review.  *See* 46 U.S.C. § 9303(f).

20.     The Coast Guard is directed by the Act to "prescribe by regulation rates and charges for pilotage services, giving consideration to the public interest and the costs of providing the services."  *Id*.  Congress also charged the Coast Guard with responsibility to prescribe regulations governing the "operation and administration" of approved pilotage pools, to "prescribe a uniform system of accounts," to "perform audits and inspections," and to "require coordination on a reciprocal basis" with Canadian pilotage organizations.  46 U.S.C § 9304.

**B.  The 2018 Notice of Proposed Rulemaking and Final Rule**

21.     On January 18, 2018 the Coast Guard issued a Notice of Proposed Rule Making. *See Great Lakes Pilotage Rates - 2018 Annual Review and Revisions to Methodology*, 83 Fed. Reg. 2,581 (the "NPRM").

22.     In the NPRM, the Coast Guard proposed pilotage rates for the 2018 navigation season.

23.     Plaintiffs, either individually or through organizations of which they are members, submitted comments to the Coast Guard in response to the NPRM.  Plaintiffs' comments highlighted, among other things, the issues raised in this Complaint.

24.     The Coast Guard promulgated its Final Rule on June 5, 2018, and the Rule became effective on July 5, 2018.  *See* 83 Fed. Reg. at 26,162.

25.     The Coast Guard's Final Rule failed to address the comments submitted by Plaintiffs in any reasoned or meaningful way or, to the extent comments were addressed, the treatment of the comments was cursory, dismissive, and without substance.

26.     The Final Rule will result in substantial over-collection of revenues, as measured against stated target revenues, by the Great Lakes pilot associations.

27.     The Coast Guard's regulations governing pilotage rates contain no explicit provision for refunding or crediting to ratepayers payments of fees that exceed targeted revenue or compensation levels for pilots.

        **1.  The Coast Guard's Use of a 270-Working Day Assumption to Calculate a Target Benchmark Compensation Figure**

28.     The Coast Guard's annual rate-setting procedures governing pilotage fees on the Great Lakes establish hourly rates paid by shipowners to three government-authorized pilot

associations, each of which has been granted by the Coast Guard exclusive rights to provide

mandatory U.S. pilotage in three geographically distinct pilotage districts.

29.     The methodology used by the Coast Guard to set annual pilotage rates

establishes a revenue target considered adequate by the Coast Guard to compensate pilots and

to fund each pilot association in the coming year.  This revenue target figure is then divided by

projected work volume estimates to derive hourly pilotage rates for designated and

undesignated waters in each of the three pilotage districts.

30.     In the NPRM seeking public comment on proposed 2018 pilotage rates, the

Coast Guard stated its intention to modify its method for establishing the pilot compensation

"benchmark" used to calculate revenues needed to offset pilot compensation requirements in

the coming 2018 rate year. 83 Fed. Reg. at 2,587-90.

31.     The 2018 NPRM recited that the proposed change in methodology was in

response to a holding by this Court that the Coast Guard's previously established compensation

benchmark methodology had been unlawfully based on salaries of Canadian pilots plus an

additional amount of ten percent.  83 Fed. Reg. 2,587-90.  Plaintiffs had challenged the

lawfulness of the Coast Guard's 2016 pilotage rate final rule because, among other reasons, the

Coast Guard's use of Canadian pilot compensation plus an additional ten percent "adder" value

was not based on evidence of record or on an adequate explanation of why the ten percent

upward adjustment of Canadian pilot compensation was necessary.

32.     The 2018 NPRM proposed to address the unlawful compensation benchmark

from the 2016 and 2017 pilotage rate rulemakings by reverting to the pre-2016 benchmark

methodology that was based on the compensation of mates serving on U.S.-flag vessels

operating on the Great Lakes.  The NPRM proposed using compensation data from labor

contracts of the American Maritime Officers Union ("AMOU") to establish compensation for mates.

33.     The AMOU labor contracts are multi-year collectively bargained contracts between AMOU and individual American vessel owners operating ships on the Great Lakes. The NPRM recites that the most recent of these contracts available to the Coast Guard covered the years 2011-2015.

34.     The 2018 NPRM stated that 2015 data from AMOU showed aggregate daily rates for mates on U.S. Great Lakes vessels of two U.S. companies of $1,142.06 and $1,124.72, figures that the Coast Guard said included "daily wage rate, vacation pay, pension plan contributions and medical plan contributions. 83 Fed. Reg. at 2,589.

35.     In the 2018 NPRM, the Coast Guard applied several adjustments to the 2015 AMOU contract figures to establish a single proposed annual average compensation target for U.S. pilots. The first of these adjustments purported to establish a weighted average of cargo carried by the two U.S. companies to derive a proportioned single target compensation figure. 83 Fed. Reg. at 2,589 (Table 4).

36.     The NPRM also applied inflation index data from federal government sources to adjust the AMOU compensation data to a 2018 value. 83 Fed. Reg. at 2,589-90 (Table 6).

37.     Before applying these adjustments, the Coast Guard also multiplied the two daily aggregate rates from the AMOU contracts by 270 to establish "a seasonal average compensation figure."  83 Fed. Reg. at 2,589.  The multiplier of 270 represents the "estimated number of days" in a nine-month Great Lakes shipping season. *Id*.

38.     After merging the two 2015 AMOU contract data figures pursuant to the operation described in Paragraph 34, *supra*, and multiplying the resulting weighted AMOU day

rate by 270, the Coast Guard NPRM established a proposed average per pilot average

compensation figure of $305,066 for the nine-month shipping season. 83 Fed. Reg. at 2,589

(Table 5).  When the Coast Guard applied its proposed inflation adjustment values, this annual

average per pilot compensation figure increased to $319,617.

39.     Industry comments[2] submitted to the agency docket on the 2018 NPRM

acknowledged a similarity of functions between mates aboard U.S.-flag Great Lakes vessels

and pilots and opined that the application of AMOU data to determine a benchmark

compensation figure was an improvement on the invalidated prior practice of referencing

Canadian pilot compensation plus ten percent.  However, the Industry comments noted that the

AMOU data cited by the Coast Guard were not transparent to the public, that more current data

than 2015 should be available to the Coast Guard and the commenting public, and that the lack

of transparency behind the "daily aggregate rate" final numbers frustrated an examination of

the elements that would enable a valid comparison of AMOU and pilot compensation data.

*Comments of Shipping Federation of Canada, the American Great Lakes Ports Association*

*and the United States Great Lakes Shipping Association*, USCG-2017-0903-0008 at p. 5

("Industry Comments").

40.     Industry comments to the agency's docket in the NPRM also challenged the

Coast Guard's use of a multiplier value of 270 days to translate the AMOU daily data, with the

aforementioned inflation adjustments, into a target per pilot average annual compensation

figure.  *Id*.  Industry comments cited Coast Guard regulations in place since the 2016 annual

ratemaking exercise that require pilots to observe 10 days per month rest periods, thus limiting

---

[2] Plaintiffs SFC, AGLPA, and USGLSA submitted comments to the Coast Guard in response
to the 2018 NPRM. Plaintiff vessel owners and operators herein are members of SFC.

the number of working days in a nine-month navigation season to approximately 200 days (a figure that would allow for seasonal variations that sometimes extend the navigability of the Seaway to ten months). Industry commenters also observed that, because the benchmark compensation was being set according to AMOU data for compensation of officers on lake vessels, consistency required that pilots be compensated only for days worked, as is the case with AMOU members. They urged this correction to the NPRM's methodology to achieve a more accurate and comparable use of AMOU data applied to pilot compensation.

41.     In their comments to the NPRM docket, Industry commenters also noted that a 200-day multiplier was necessary given that Coast Guard staffing decisions authorizing the number of pilots for each of the three pilotage districts were based on a needs assessment that assumed a 200-day work season.  Because the ratepayer Plaintiffs were expected to fund through the hourly rate mechanism the costs of additional pilots added in order to permit observance of the 10-day per month rest requirement, they should not be subjected to the additional costs of an assumption that the rest period was not being observed.

42.     The 2018 Final Rule rejected the Industry Comments to the NPRM docket concerning the use of a 200-day, as opposed to a 270-day, assumption for working days in a navigation season. 83 Fed. Reg. at 26,170-71. The Coast Guard stated in the Final Rule that, despite the 10-day per month rest requirement for pilots that was put in place in the 2016 final rule, "Great Lakes pilots are expected to be on call and available for work each day during the entire 270-day season." *Id*. at 26,170. The Coast Guard also justified the use of the 270-day period for calculating benchmark pilot compensation by referring generally, without data, to the necessity of "recruiting and retaining suitable number of experienced pilots. . . ." *Id*. The Coast Guard described Industry commenters' position as one that "has merit," but justified the

use of the 270-day period by referring to vague, undocumented pilot association claims

concerning recruitment and retention and reference to pilot compensation in other ports. *Id.*

43.     The Final Rule further stated that the benchmark pilot compensation figure so

established was "based on the idea that a Great Lakes pilot should earn, on average, about 1.5

times the salary of a first mate [on U.S.-flag Great Lakes vessels] [footnote omitted], given the

demanding nature of Great Lakes pilotage work and the experience required."  83 Fed. Reg. at

26,168. The omitted footnote in this quoted material refers to the Federal Register pages of the

Notice of Proposed Rulemaking, none of which explain or seek public comment on the validity

or applicability of an "idea" that a "1.5" factor should be added to Great Lakes mates

compensation to derive a compensation level for Great Lakes pilots.

### 2.  The Coast Guard's Application in the Final Rule of "Guaranteed Overtime" Data from AMOU Sources That Were Submitted in The Notice and Comment Period

44.     In the "Discussion of Comments" section of the Coast Guard's Final Rule, the

Coast Guard made further upward adjustments to the benchmark compensation figure. Citing

comments from the AMOU and pilot association commenters, the Coast Guard increased the

Final Rule benchmark compensation to include what the AMOU described as "standard

overtime compensation that is consistently earned by U.S. merchant mariners under AMO

contracts." 83 Fed. Reg. at 26,169. AMOU comments stated that this "standard overtime" was

the equivalent of an additional 40 hours per month of compensation to AMO personnel on

U.S.-flag Great Lakes vessels. The pilot and AMOU commentators referred to overtime pay

earned by AMOU members as "guaranteed overtime" and urged that the benchmark

compensation figure in the proposed rule be increased by $60.07/hour *x* 40, or $21,625 over

the course of a nine-month shipping season. *Id.*

45.     The 2018 Final Rule states that the "information on guaranteed overtime is new to the Coast Guard," but concluded that it "cannot now ignore highly relevant information simply because it was not apparent at the beginning of the rulemaking process." *Id*. The Final Rule reflects no effort by the Coast Guard to validate the amount of the so-called "guaranteed overtime" or to determine the comparability between the circumstances under which it is paid to crews of U.S.-flag Great Lakes vessels and the functions, hours, and working conditions of Great Lakes pilots.

46.     The Final Rule adjusted downward the asserted "guaranteed overtime" figure of $60.07 per hour to "deflate" that figure to the levels of 2015 AMO contract data being used by the Coast Guard as its target benchmark and then, using government data, reinflated that figure to a daily amount of $74.24. 83 Fed. Reg. at 26,169-70. After conforming this figure to the arithmetic operations that had been undertaken in the NPRM on 2015 AMOU data, the Final Rule incorporated the "new" guaranteed overtime figure into the 2018 benchmark compensation, resulting in an increase of that figure from $319,617 to $325,110. 83 Fed. Reg. at 26,170 (Table 5).

47.     Great Lakes pilots do not perform "overtime" labor of the same or similar nature as that performed by or expected of mates on U.S.-flag Great Lakes vessels.

### 3.   The Coast Guard's Use of Ten Years of Traffic Volume Data to Estimate Traffic Volume, But Shorter Periods to Determine Projected Expenses and Manning Levels

48.     In addition to advocating for a 200-day compensation multiplier, Industry commenters challenging the Agency's use of a ten-year moving average to calculate traffic levels in the coming rate year.  Industry commenters asserted that one of the causes for repeated over-realization of revenues by pilot associations in recent years was asymmetric use

of a ten-year average of traffic volume data against much shorter periods for projecting operating expenses and pilot staffing levels (three years and current year, respectively). The anomaly in rate calculation asserted in Industry's comments was that the ten-year period included a period of substantially depressed traffic volume (and concomitant bridge hours for pilots) caused by the recession in 2008-2009 and lasting beyond that period until full recovery in 2014. This change in methodology would result in an approximate reduction of hourly pilotage rates across all three regions of approximately 16 percent. 83 Fed. Reg. at 26,173.

49.     The Final Rule rejected this proposed change in methodology, stating that traffic volumes "can vary significantly from year to year, and a 10-year average is a good way to smooth out variations in traffic caused by global economic conditions." The Agency also asserted that other elements of the annual rate calculation, such as operating expenses, "do not have wide swings from year to year. . . ." and that, in some years, use of a ten-year average had overestimated traffic volumes. *Id.*

### 4. The Coast Guard's Failure to Overpayment of Pilotage Fees Attributable to Methodological Errors in Prior Calendar Years, Resulting Address Effects on Ratepayers, and Pattern of Significant Over-Collection of Targeted Revenues

50.     Industry commenters stated that Coast Guard ratemaking processes had resulted in substantial over-collections of pilotage revenues and over-compensation of pilots in the 2015, 2016, and 2017 Final Rules.  Industry Comments, USCG-2017-0903-0008 at pp. 1-3. Commenters also stated that Coast Guard rate-setting methodologies had resulted in significant disparities in the cost of Canadian pilotage versus U.S. pilotage for the same or nearly similar vessel transits.  *Id.*  As an example, commenters cited a transit from Thunder Bay, on Lake Superior, to Port Colborne, Ontario, at the extreme eastern end of Lake Erie, as costing roughly

twice as much under 2016 Coast Guard pilotage rates for U.S. pilots as the same voyage cost if Canadian pilots were employed. *Id.* at p. 2 n.2.

51.     In addition, pilotage rates since 2015 have resulted in significant over-collection of targeted revenues:

|      | **Targeted Revenue Collection**[3] | **Actual Revenue Collection** |
|------|-----------------------------------|-------------------------------|
| **2015** | $15,583,653 | $18,996,313 |
| **2016** | $17,453,678 | $28,222,522 |
| **2017** | $22,326,381 | $26,429,565 |

The Final Rule established a targeted revenue figure of $25,156,442 for the 2018 navigation season, *see* 83 Fed. Reg. at 26,187, and increased hourly pilotage rates by approximately 12 percent (varying within each pilotage district). Even though pilotage rates for 2018 *increased* under the Final Rule, the targeted revenue figure for 2018 is *less than* the actual revenue collection by the pilotage districts under the lower 2017 rates. The record does not cite to any evidence indicating any factor that would cause a reduction in revenue from the prior year if 2017 rates remained the same. At the time of the publication of the Final Rule governing 2018 rates, the Coast Guard had access to and knew the actual revenue figures for 2017.

52.     Industry comments stated that the proposed 2018 rates would continue the pattern of significant over-collection of targeted revenues and noted that the 2018 NPRM made no provision for return to ratepayers of over-payments or adjustment of rates to reflect chronic over-realization of income by pilots.  In the absence of the development or proposal for a remedy for substantial overpayments by ratepayers, Industry comments stated that the 2018

---

[3] The targeted revenue collection figures for the 2015 and 2016 navigation seasons are referenced in the Coast Guard's final rule for 2016, 81 Fed. Reg. 11,908, 11,934, 11,938 (Table 32) (Mar. 7, 2016). The targeted revenue collection figure for the 2017 navigation season is referenced in the 2018 Final Rule, 83 Fed. Reg. at 26,187 (Table 39).

rules must be examined to avoid "additional, potentially irretrievable overcharges . . . ." Industry Comments, USCG-2017-09-3-0008 at p. 2.

53.     Industry comments contended that chronic over-collection of revenues was attributable to several causes, including failure to collect and maintain accurate and current financial information, operational data, and compensation specifics from pilot associations in formats that permit monitoring of revenue collections, and over-reliance on general assertions of recruitment, retention and attrition difficulties without requirements for accurate data that would identify and quantify causes (if any) for such issues. *Id*. at pp. 2-3.

54.     The Coast Guard's Final Rule dismissed Industry commenters' concerns about chronic over-collection of revenue as "not a highly salient issue at this time" and appeared to attribute over-collection of revenues to "higher traffic than expected." The Coast Guard also dismissed the impact of pilotage fees levels as not having "increased to levels that threaten the economic viability of Great Lakes Shipping." 83 Fed. Reg. at 26,175.

55.     The Coast Guard does not collect or publish actual pilot compensation data against which the Agency, ratepayers, or the commenting public can evaluate the adequacy of given rates in achieving targeted average per-pilot annual compensation.

### 5.     The Coast Guard's Use of "Working Capital Fund" to Expand Revenue Requirements and Compensation Levels

56.     Industry commenters identified the NPRM's "Working Capital Fund" (Step 5) as a component of the Coast Guard's methodology that appeared to serve no purpose other than to add additional costs that generated revenue requirements to be covered by the ultimate hourly rate levels.   In prior years, this segment of the Coast Guard's methodology had been referred to as "Return on Investment," a term that had no commonly understood relationship to the structure of pilotage associations on the Great Lakes.

57.     The Final Rule addressed this comment by saying that the Working Capital component of the methodology was to permit pilot associations to obtain commercial lending for "infrastructure projects," to enable pilots to demonstrate that they "can achieve a return on investment," and to use funds generated as part of the "working capital" component of the rate setting methodology "to be used to finance those loans." 83 Fed. Reg. at 26,173.

58.     Addressing concerns expressed by commenters that revenues generated through hourly rates derived from the "working capital" element of the methodology would end up being compensation to pilots, the Coast Guard stated that such revenues should not be so used, but that "this ratemaking proceeding is not the proper venue to determine whether and how the Coast Guard could or should implement limitations on the use of working capital fund money." *Id.*

### FIRST CLAIM
**Use of a 270-Working Day Assumption to Calculate a Target Benchmark Compensation Figure and Reliance on Data Not in the Record in Violation of the Administrative Procedure Act--Arbitrary and Capricious Agency Action, Agency Abuse of Discretion, and Agency Action not in Accordance with Law**

59.     Plaintiffs incorporate each and every allegation contained in Paragraphs 1-43 as if fully set forth herein.

60.     In using a 270-working day assumption to calculate a target benchmark compensation figure, relying on data not in the record and not available to the public, and validating results with an unquantified "idea that Great Lakes pilots should earn, an average 1.5 times the salary of a first mate," the Coast Guard acted arbitrarily and capriciously, abused its discretion, and acted contrary to law within the meaning of 5 U.S.C. § 706(2)(A), in the following ways, among others:

        a.     failing meaningfully to address rulemaking comments;

b.      failing to provide rational basis for its decision;

c.      providing a pre-textual explanation for using a 270-working day multiplier;

d.      departing from prior determinations, including but not limited to the determination that pilots are required to observe 10 day per month rest periods;

e.      relying on data not in the record or available to commenters and the public; and

f.      failing to set rates by "giving consideration to the public interest and the costs of providing the services," as required by statute. 46 U.S.C. § 9303(f).

## SECOND CLAIM
**Application of AMO "Guaranteed Overtime" Assertions to Pilotage Compensation in Violation of the Administrative Procedure Act--Arbitrary and Capricious Agency Action, Agency Abuse of Discretion, and Agency Action not in Accordance with Law**

61.      Plaintiffs incorporate each and every allegation contained in Paragraphs 1-27 and 44-47 as if fully set forth herein.

62.      In applying "guaranteed overtime" representation by AMO and pilots from AMO sources to increase the target compensation figure, the Coast Guard acted arbitrarily and capriciously, abused its discretion, and acted contrary to law within the meaning of 5 U.S.C. § 706(2)(A), in the following ways, among others:

a.      failing to provide rational basis for its decision;

b.      providing a pre-textual explanation for using "guaranteed overtime" data; and

c.       failing to set rates by "giving consideration to the public interest and the costs of providing the services," as requested by statute 46 U.S.C. § 9303(f).

### THIRD CLAIM
**Application of Disparate Data Periods Data in Violation of the Administrative Procedure Act--Arbitrary and Capricious Agency Action, Agency Abuse of Discretion, and Agency Action not in Accordance with Law**

63.     Plaintiffs incorporate each and every allegation contained in Paragraphs 1-27 and 48-49 as if fully set forth herein.

64.     In using ten years of traffic data to project 2018 traffic volumes, but using shorter periods to determine expenses and manning levels, the Coast Guard acted arbitrarily and capriciously, abused its discretion, and acted contrary to law within the meaning of 5 U.S.C. § 706(2)(A), in the following ways, among others:

a.       failing to meaningfully address rulemaking comments;

b.       failing to provide rational basis for its decision;

c.       providing a pre-textual explanation for the use of varying time periods for traffic volumes, projected expenses, and manning levels; and

d.       failing to set rates by "giving consideration to the public interest and the costs of providing the services," as required by statute 46 U.S.C. § 9303(f).

## FOURTH CLAIM
**Failure to Address Effects on Rate Payers of Overpayment of Pilotage Fees
Attributable to Methodological Errors in Prior Years in Violation of the
Administrative Procedure Act--Arbitrary and Capricious Agency Action,
Agency Abuse of Discretion, and Agency Action not in Accordance with
Law**

65.     Plaintiffs incorporate each and every allegation contained in Paragraphs 1-27

and 50-55 as if fully set forth herein.

66.     In dismissing the effects on rate payers of overpayment of pilotage fees

attributable to the Coast Guard's methodological errors in calendar years 2016 and 2017, and

in failing to provide for credit or refund of over collected amounts; the Coast Guard acted

arbitrarily and capriciously, abused its discretion, and acted contrary to law within the meaning

of 5 U.S.C. § 706(2)(A), in the following ways, among others:

        a.     failing to meaningfully address rulemaking comments;

        b.     failing to provide any rational basis for its decision; and

        c.     failing to set rates by "giving consideration to the public interest and the

             costs of providing the services." 46 U.S.C. § 9303(f).

## FIFTH CLAIM
**Failure to Eliminate "Working Capital" as a Basis for Additional Revenue
Requirements or to Bound Revenues so Raised to Particular Uses in
Violation of the Administrative Procedure Act--Arbitrary and Capricious
Agency Action, Agency Abuse of Discretion, and Agency Action not in
Accordance with Law**

67.     Plaintiffs incorporate each and every allegation contained in Paragraphs 1-27

and 56-58 as if fully set forth herein.

68.     In failing to eliminate the "working capital" component of its rate methodology

as a basis for additional revenue requirements and further failing to limit or otherwise bound

the revenues raised as a result of the "working capital" element of the methodology to

particular uses, the Coast Guard acted arbitrarily and capriciously, abused its discretion, and acted contrary to law within the meaning of 5 U.S.C. § 706(2)(A), in the following ways, among others:

    a.    failing meaningfully to address rulemaking comments;

    b.    failing to provide rational basis for its decision; and

    c.    failing to set rates by "giving consideration to the public interest and the costs of providing the services," as required by statute. 46 U.S.C. § 9303(f).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Declare, hold unlawful, and set aside the Final Rule as arbitrary, capricious, an abuse of discretion, in excess of statutory authority or limitation or short of statutory right, and contrary to procedures required by law;

B.    Vacate and remand the subject rulemaking proceeding to the Coast Guard with instructions to direct recalculation of rates for 2018, and to require future rates to be calculated so as to avoid over collection of pilotage fees from ratepayers;

C.    Award Plaintiffs their costs and reasonable attorneys' fees incurred herein under the Equal Access to Justice Act and other applicable provisions of law; and

D.    Award Plaintiffs such further and other relief as this Court deems proper.

Dated: November 16, 2018

Respectfully submitted,

THOMPSON COBURN LLP

By /s/ C. Jonathan Benner
  C. Jonathan Benner (#181610)
  1909 K Street, N.W.
  Suite 600
  Washington, D.C.  20006-1167
  202-585-6900
  FAX 202-585-6969
  jbenner@thompsoncoburn.com

  *Attorney for Plaintiffs*