## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMERICAN GREAT LAKE PORTS ASSN.**, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **UNITED STATES COAST GUARD**, *et al.*, <br><br> Defendants, | Case No. 18-cv-2650 (CRC) |

## MEMORANDUM OPINION

The United States Coast Guard undertakes an annual rulemaking to establish rates that international shipping companies operating on the Great Lakes must pay for American seamen who pilot their vessels. And each year, it seems, either the shipping companies or the associations that supply the pilots sue the Coast Guard to challenge aspects of the rulemaking. The shippers perennially complain that the rates are too high, while the pilots gripe that they are too low. The latest iteration of this pattern comes as a challenge by the shipping industry to the Coast Guard's 2018 Final Rule. For the reasons explained below, the Court rejects the shippers' challenge and will, accordingly, grant summary judgment in favor of the Coast Guard and the pilot associations that have intervened as defendants.

### I. Background

#### A. The Statutory Framework

The Great Lakes Pilotage Act of 1960 (the "Act") obligates all foreign shipping vessels, as well as U.S. vessels engaged in foreign trade, to use either American or Canadian registered pilots to navigate the American portion of the Great Lakes and the St. Lawrence Seaway. 46

U.S.C. § 9302(a)(1).[1]  The Coast Guard has partitioned the American portions of those waters into three districts, which are further divided into "designated" and "undesignated" waters.[2]  Id. Each district has one private pilotage association that supplies pilots for the shippers' use.  While the associations are private, the Coast Guard sets the number of pilots that must be registered in each district, oversees the organizational structure of the three pilotage associations, and establishes the work rules for the pilots.  46 C.F.R. §§ 401.220, 401.320, 401.340.

The Act requires the Secretary of Homeland Security to "prescribe by regulation rates and charges for pilotage services," and the Secretary has delegated that task to the Great Lakes Pilotage Office of the United States Coast Guard.  Dep't of Homeland Sec. Delegation No. 0170.1, para. II (¶ 92.f).  The statute does not prescribe any particular method for calculating appropriate rates.  It merely instructs the Coast Guard to establish rates "giving consideration to the public interest and the costs of providing the services."  46 U.S.C. § 9303(f).  The statute requires the Coast Guard to conduct a full ratemaking every five years and an annual review each year.  Id.

The Court details the rate-setting process in detail below.  In sum, however, the Coast Guard projects how much total revenue each pilot association will need for the upcoming shipping season and then calculates a pilot's hourly rate by dividing that figure by the number of

_____

[1] "Generally, vessels are assigned a U.S. or Canadian pilot depending on the order in which they transit a particular area of the Great Lakes, and do not choose the pilot they receive." Great Lakes Pilotage Rates—2018 Annual Review and Revisions to Methodology, 83 Fed. Reg. 26,162, 26,163 (June 5, 2018).

[2] In designated waters, a pilot must be fully engaged in the navigation of the vessel at all times, while in undesignated waters, a pilot need only "be on board and available to direct the navigation of the vessel at the discretion of and subject to the customary authority of the master." 46 U.S.C. § 9302(a)(1).

hours the Coast Guard anticipates that pilots will have to work to satisfy the shipping demand. The Coast Guard aims to set the rate at a level high enough to enable the associations to recoup their operating expenses, compensate the pilots, and retain an additional return to fund capital improvement projects like ship repairs.

More specifically, Coast Guard uses the following ten-step process to establish hourly pilotage rates for the upcoming shipping season, which runs from mid-March to mid-December. See Great Lakes Pilotage Rates—2018 Annual Review and Revisions to Methodology, 83 Fed. Reg. 26,162, 26,170 (June 5, 2018) ("2018 Final Rule").[3] In this case, only the steps marked with an asterisk are challenged by Plaintiffs.

Step 1: **Recognize previous operating expenses.** The Coast Guard determines each association's operating expenses based on audited statements supplied by the associations. The audited expenses lag the annual ratemaking process by three years—meaning that the 2018 ratemaking relied upon 2015 expense data.

Step 2: **Adjust operating expenses for inflation or deflation.** Using the expenses recognized in Step 1, the Coast Guard applies inflation adjustors to update the figures for the current year.

Step 3: **Determine number of pilots needed.** Using a staffing model that accounts for the number of pilots needed during the peak traffic periods at the beginning and close of the season, the Coast Guard estimates the number of pilots that will be needed to satisfy demand.

*Step 4: **Set a target pilot compensation benchmark.** Using a two-step process, the Coast Guard determines the aggregate revenue needed for pilot

---

[3] Although this exact ten-step process was first introduced in 2017, the challenged elements of these steps—determining the target pilot compensation benchmark, funding working capital, and calculating the average traffic flows—have been a part of the Coast Guard's ratemaking process for several years, albeit in slightly different forms. See Great Lake Pilotage Rate Methodology, 61 Fed. Reg. 21,081, 21,083 (May 9, 1996) (discussing "pilot compensation targets" and "return on investment"—the earlier term for the working capital fund); Great Lakes Pilotage Rates—2016 Annual Review and Changes to Methodology, 80 Fed. Reg. 54,484, 54,507 (Sept. 10, 2015) (discussing the multi-year averages of traffic flows).

compensation in each district. First, the Coast Guard calculates the total compensation needed for each pilot using a compensation benchmark. Next, it multiplies that figure by the projected number of pilots needed (as determined in Step 3) to determine total target pilot compensation for the year.

*Step 5:     **Project working capital fund.** The Coast Guard calculates the contributions required for the pilotage associations' working capital fund, which is a pool of money intended for use by the associations for infrastructure and other capital improvement projects. This figure is calculated by adding the total operating expenses (Step 2) to the total pilot compensation (Step 4) and then multiplying that total by the preceding year's average annual rate of return for new issues of high-grade corporate securities.

Step 6:     **Calculate needed revenue.** The Coast Guard adds the projected operating expenses (Step 2), the total target pilot compensation (Step 4), and the working capital fund (Step 5) to arrive at total projected needed revenue for each association.

*Step 7:     **Initially calculate base rates.** At this step the Coast Guard determines what the hourly pilotage rate should be in order to generate the total projected revenue. To do this, the Coast Guard first calculates the traffic averages for each area over the past ten years, as expressed by pilot hours worked. It then divides the projected needed revenue (Step 6) by the ten-year traffic average for each area to arrive at the base hourly rate for each area.

Step 8:     **Calculate average weighting factors by area.** Vessels do not all pay the same rate for pilotage services, but instead pay the base rate multiplied by a weighting factor, a number between 1.0 and 1.45 that corresponds to the size of a vessel. At this step, the Coast Guard calculates the average weighting factor.

Step 9:     **Calculate revised base rates.** The Coast Guard modifies the initial base rate (Step 7) to account for the average weighting factors (Step 8) by dividing the initial base rate by the average weighting factor to produce a revised rate.

Step 10:     **Review and finalize rates.** Lastly, the Coast Guard reviews the revised base rate to ensure that the calculated rates meet the goals of the Great

> Lakes Pilotage Act and 46 CFR § 404.1(a)—that is, to promote efficient, safe, and reliable pilotage service on the Great Lakes.[4]

46 C.F.R. §§ 404.101–404.110; Great Lakes Pilotage Rates—2018 Annual Review and Revisions to Methodology, 83 Fed. Reg. 2,581, 2,584 (Jan. 18, 2018) ("2018 NPRM"). The Coast Guard initiates a ratemaking by publishing a Notice of Proposed Rulemaking, detailing the agency's calculations at each step of the process and inviting public comment. After the comments have been reviewed and any necessary adjustments made in response, the Coast Guard publishes a Final Rule establishing the new rates.

B. Past Ratemakings

To understand Plaintiffs' challenges to the 2018 Final Rule, a brief recap of the Coast Guard's previous ratemakings—and relevant aspects of litigation that ensued—is in order. The Coast Guard employed the same ratemaking methodology from 1995 to 2015. See Great Lakes Pilotage Rates—2016 Annual Review and Changes to Methodology, 80 Fed. Reg. 54,484, 54,486 n.13 (Sept. 10, 2015) ("2016 NPRM"). In 2015, the agency announced that it intended to substantially revise its approach in its 2016 Rule. Id. at 54,484. The Coast Guard cited two reasons for adopting a new system. First, it explained that "over many years both pilots and industry have identified certain methodology issues that they believe significantly distort ratemaking calculations[,]" and "[p]ilot associations believe those distortions result in low rates

---

[4] Using this ten-step process, the Coast Guard ultimately develops six different hourly pilotage rates—one rate for designated waters and one for undesignated waters, for each of the three districts. See 2018 NPRM, 83 Fed. Reg. at 2,596. Lest there be any confusion, the *hourly* pilotage rates should not be confused for the *daily* wage rates calculated at Step 4, which are multiplied by the number of days in the shipping season to arrive at a single *yearly* target compensation benchmark for all pilots. Although there are six different rates that the shippers pay, pilot compensation is intended to be constant and there is therefore a single wage rate for all pilots. Id. at 2,588 ("[T]he ratemaking methodology used today calculates a single wage rate . . . .").

that contribute to their difficulty in retaining pilots and attracting applicant pilots." Id. Second,

the Coast Guard stated that in prior ratemakings, it had used contract data from a particular

merchant mariner union—the American Maritime Officers Union ("AMOU")—to calculate the

benchmark for pilot compensation (Step 4 above), but the union had ceased to make that data

available. See id. (explaining that the AMOU had come to view "that data as proprietary and

will no longer disclose it to the Coast Guard"). Moreover, the Coast Guard felt compelled to

find a new compensation benchmark after Judge Chutkan upheld a challenge brought by a

pilotage association to the Coast Guard's use of partial AMOU contract data that the union

"affirmatively stated was inaccurate." See St. Lawrence Seaway Pilots Ass'n v. U.S. Coast

Guard, 85 F. Supp. 3d 197, 202, 206 (D.D.C. 2015).

The 2016 Rule changed the Coast Guard's ratemaking methodology in a number of ways,

many of which were subsequently challenged in this court by the shipping industry and related

groups. See Am. Great Lakes Ports Ass'n v. Zukunft, 296 F. Supp. 3d 27, 35 (D.D.C. 2017);

Great Lakes Pilotage Rates—2016 Annual Review and Changes to Methodology, 81 Fed. Reg.

11,908 (Mar. 7, 2016) ("2016 Final Rule"). First, the shipping companies contended that "the

Coast Guard's promulgation of the modified rate-making methodology was not an exercise in

reasoned decisionmaking because it was based in part on the Coast Guard's belief that low

pilotage compensation was responsible for the recruitment and retention problems, which

Plaintiffs contend[ed] was not supported by empirical evidence." Zukunft, 296 F. Supp. 3d at

39. Rejecting this argument, Judge Contreras held that "the Coast Guard could rationally

conclude that there existed 'chronic pilot attraction and retention difficulties' and that these

difficulties were caused, at least in part, by the under-compensation of pilots." Id. at 39–40.

Indeed, the Coast Guard's Final Rule explained that "the Great Lakes system had lost twenty-

two percent of its pilots between 2007 and 2014," and there was considerable evidence from pilotage associations that this attrition was primarily due to low compensation. Id. Although Plaintiffs demanded empirical evidence demonstrating pilot attrition, Judge Contreras concluded that the Coast Guard was not required to provide such data. Id. at 40.

Next, Plaintiffs challenged the Coast Guard's decision to calculate how many pilots were needed in a given shipping season based on the "number of pilots needed to meet each shipping season's peak pilotage demand periods without interruption to service." Id. at 41 (quoting 2016 NPRM, 80 Fed. Reg. at 54,489). Use of this "peak-staffing model," the shippers argued, unfairly caused them to bear the cost of peak-demand availability throughout the season, even though demand only spiked at the beginning and end of the seasons. Judge Contreras rejected this argument as well, finding that the Coast Guard's rationale for using the peak-staffing model— that it promoted safe piloting on the Great Lakes by ensuring that pilots would have sufficient rest time—was "amply" supported by the record. Id. at 43.

Third, Plaintiffs challenged the Coast Guard's decision to estimate target pilot compensation by relying on the rates of *Canadian* Great Lakes pilots (who are not compensated through the pilot associations affected by the Coast Guard's rates). Id. at 45. No longer able to use the AMOU data, the Coast Guard had determined that relying on the rates charged by Canadian pilots (the "Canadian benchmark") was the best option because the two groups of pilots performed substantially similar work. However, because Canadian pilots were government employees and therefore entitled to "guaranteed minimum compensation with increases for high-traffic periods, . . . retirement, healthcare, . . . vacation benefits, [and] limited professional liability," while American pilots did not receive any of these employment benefits, the Coast Guard determined that additional compensation for American pilots was required in

order to make the two rates comparable.  Id. at 45 (quoting 2016 NPRM, 80 Fed. Reg. at 54,498).  Accordingly, the Coast Guard set benchmark compensation at the Canadian pilots' salary plus ten percent.  2016 NPRM, 80 Fed. Reg. at 54,498.  Plaintiffs challenged as arbitrary and capricious both the decisions to rely on Canadian pilots' salary and the ten-percent adjustment.  Judge Contreras upheld the Coast Guard's use of Canadian pilots' salaries as a compensation benchmark, finding that the decision was well-supported by the record.  Zukunft, 296 F. Supp. 3d at 45.  But he rejected the ten-percent adjustment.  Caught between the shippers' position (that no additional compensation was needed) and the pilots' position (that a 25–37% increase was required), Judge Contreras found the agency had arbitrarily split the difference, settling on ten percent without conducting any analysis or considering the data offered in comments to its proposed rulemaking.  Id. at 47–48.

Because Judge Contreras's opinion on the 2016 Rule was issued in November 2017, after the Coast Guard had already issued its NPRM and Final Rule for 2017, the Coast Guard's primary response to the ruling came in the 2018 Rule challenged here.  On January 18, 2018, the Coast Guard issued an NPRM which proposed several changes.  See 2018 NPRM, 83 Fed. Reg. at 2,582–84.  After receiving comments from the shipping industry and the pilotage associations, the Coast Guard promulgated the Final Rule on June 5, 2018, and it went into effect a month later.  2018 Final Rule, 83 Fed. Reg. at 26,163.

Thereafter, Plaintiffs in this action—a collection of international shipping companies and interested shipping industry and port associations—filed suit against the Coast Guard and the Commandant of the Coast Guard, who is sued in his official capacity.  They challenge five aspects of the Coast Guard's 2018 Final Rule under the Administrative Procedures Act ("APA").  The Court permitted the St. Lawrence Seaway Pilots Association, the Lakes Pilots Association,

Inc., and the Western Great Lakes Pilots Association LLP (collectively, "Pilots") to intervene as defendants in support of the rule.  All sides have moved for summary judgment.

## II.    Standard of Review

Under the APA, the Court must set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).  The scope of review under the APA's arbitrary and capricious standard is "narrow," and the Court "is not to substitute its judgment for that of the agency."  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983).  "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action . . . ."  Id. (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).  Agency action is

> arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to evidence before the agency, or is so implausible that it could not ascribe to a difference in view or the product of agency expertise.

Id.  "[A]n agency's decision [need not] be a model of analytic precision to survive a challenge."  Frizelle v. Slater, 111 F.3d 172, 176 (D.C. Cir. 1997) (alteration in original) (internal quotation marks omitted).  "All that is required is that the [agency's] decision minimally contain a rational connection between the facts found and the choice made."  Id. (internal quotation marks omitted).

A regulation that resulted from notice-and-comment rulemaking will be deemed arbitrary and capricious if the issuing agency failed to address significant comments submitted during the rulemaking.  See PPL Wallingford Energy LLC v. FERC, 419 F.3d 1194, 1198 (D.C. Cir. 2005).  An agency's obligation to respond, however, is not "particularly demanding."  Pub. Citizen, Inc. v. Fed. Aviation Admin., 988 F.2d 186, 197 (D.C. Cir. 1993).  Rather, "[t]he failure to respond to

comments is significant only insofar as it demonstrates that the agency's decision was not 'based on a consideration of the relevant factors.'" Thompson v. Clark, 741 F.2d 401, 409 (D.C. Cir. 1984) (quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971)). Additionally, as relevant here, greater-than-normal deference is owed to the "Coast Guard's expertise . . . in maritime safety." Pub. Employees for Envtl. Responsibility v. Beaudreau, 25 F. Supp. 3d 67, 100 (D.D.C. 2014) (quoting Collins v. Nat'l Transp. Safety Bd., 351 F.3d 1246, 1253 (D.C. Cir. 2003)).[5]

In APA cases involving cross-motions for summary judgment, "the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (collecting cases). In such cases, "district courts do not duplicate agency fact-finding efforts. Instead they address a predominantly legal issue: Did the agency 'articulate a rational connection between the facts found and the choice made?'" James Madison Ltd. By Hecht v. Ludwig, 82 F.3d 1085, 1096 (D.C. Cir. 1996) (quoting Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281 (1974)). The plaintiff bears the burden of establishing the invalidity of the agency's action. City of Olmsted Falls, Ohio v. FAA, 292 F.3d 261, 271 (D.C. Cir. 2002).

---

[5] The Pilots contend that the Coast Guard is entitled to an even higher degree of deference because "courts are particularly deferential when reviewing ratemaking orders." Sorenson Commc'ns, LLC v. FCC, 897 F.3d 214, 223 (D.C. Cir. 2018) (quoting Sw. Bell Tel. Co. v. FCC, 168 F.3d 1344, 1352 (D.C. Cir. 1999); see also Ass'n of Oil Pipe Lines v. FERC, 83 F.3d 1424, 1431 (D.C. Cir. 1996) ("Because the subject of our scrutiny is a ratemaking—and thus an agency decision involving complex industry analyses and difficult policy choices—the court will be particularly deferential to the Commission's expertise."). Plaintiffs disagree, noting that Judge Chutkan recently declined to extend extra deference to the Coast Guard outside of matters of maritime safety. St. Lawrence Seaway Pilots Ass'n, Inc., 85 F. Supp. 3d at 204 n.9. Because the Court concludes that the entirety of the Coast Guard's rulemaking survives standard arbitrary and capricious review, it need not resolve this question.

### III. Analysis

Plaintiffs mount five separate challenges to the 2018 Final Rule under the APA. First, Plaintiffs claim that the Coast Guard erred at Step 4 of the ratemaking process by arbitrarily including overtime wages paid to AMOU first mates in the target compensation benchmark. The inclusion of overtime wages increases benchmark compensation and the resulting pilotage rate. Second, Plaintiffs contend that the Coast Guard lacked a reasonable basis to assume (at Step 4) that pilots work 270 days during the shipping season. The number of work days matters because the Coast Guard multiplies this figure by the pilots' daily aggregate wage to arrive at total pilot compensation for the season. Plaintiffs urged the Coast Guard to assume 200 working days, which would have reduced total target compensation and, therefore, the hourly rate. Third, Plaintiffs assert that the Coast Guard did not adequately explain its allowance for and calculation of "working capital" to fund infrastructure improvement projects. Fourth, Plaintiffs object to the Coast Guard's use of a ten-year rolling average of actual pilot work hours (or "traffic") to estimate pilot demand in the upcoming season. At Step 7, total projected revenue (Step 6) is divided by this ten-year average to calculate base hourly pilotage rates. Plaintiffs claim that inclusion of lower traffic years during the 2008–2013 recession results in an underestimation of actual traffic and thereby unreasonably inflates the resulting base hourly rate. Fifth, Plaintiffs contend that the Coast Guard's methodology ignores what it characterizes as chronic over-realization of revenue in recent years. The Court addresses each challenge in turn below.

#### A. AMOU Overtime Compensation

The shippers contest the Coast Guard's inclusion of AMOU overtime compensation in the agency's calculation of the pilot compensation benchmark. As described above, the Coast Guard had for decades used compensation data supplied by the AMOU to set the pilot

compensation benchmark but had to search for a new method in 2015 after the union withheld its contracts from public disclosure. The Coast Guard's decision to use the compensation of Canadian Great Lakes pilots as an alternative benchmark in the 2016 ratemaking was challenged by the shippers, and Judge Contreras proceeded to hold that while the Coast Guard's reliance on Canadian pilots' compensation was rational, its use of a ten-percent adjustment factor was arbitrary and capricious. Zukunft, 296 F. Supp. 3d at 46–48.

As the Coast Guard approached its 2018 ratemaking—the first to occur after Judge Contreras's opinion—it thus faced a dilemma in selecting the appropriate benchmark. Recognizing the predicament, the Coast Guard announced that it would undertake "a comprehensive, multi-year analysis of pilot compensation practices to develop a more appropriate benchmark," the results of which would not be available until the 2020 rate adjustment. 2018 NPRM, 83 Fed. Reg. at 2,587–88. Meanwhile, the Coast Guard explained, "there is a need for an interim benchmark level to be developed on short notice and with limited time to gather new data." Id. The Coast Guard weighed several options for this interim benchmark. It first considered continuing to use Canadian pilot compensation, but ultimately determined that doing so was not feasible within the constrained time period due to the agency's inability to quantify the additional employment benefits that Canadian pilots received. 2018 Final Rule, 83 Fed. Reg. at 26,165–68. Further, the Coast Guard explained that using the Canadian pilots' compensation was not advisable because volatility in the U.S.-Canadian exchange rate would cause American Great Lakes pilots' salaries to fluctuate widely from year to year. Id. at 26,166. The Coast Guard next evaluated using pilot compensation from other American pilot associations. It rejected the feasibility of this alternative as well, however, explaining that compensation in other jurisdictions varied widely, ranging from $173,554 to

$758,922 per year, and that little information was available concerning how those other compensation levels were set. Id. at 26,167–69.

Accordingly, due to the press of the statutory deadline and a lack of better alternatives, the Coast Guard's 2018 NPRM proposed reverting to using compensation data for AMOU first mates as the interim benchmark rate. 2018 NPRM, 83 Fed. Reg. at 2,588. Although the Coast Guard lacked access to current AMOU contract information, the AMOU had previously supplied information for its first mates' pay through the 2015 calendar year. Id. The Coast Guard determined that "the most efficient solution for an interim compensation benchmark" would be "to derive a compensation figure using the 2015 AMOU data, and then apply inflationary adjustments to that data to arrive at an equivalent level for the 2018 shipping season." Id. In stating its intent to use AMOU data, the Coast Guard requested "comments on whether we have correctly applied the terms of the 2015 contract, or used correct data, to the calculation of target pilot compensation under this proposed mode" and explicitly noted that it "may adjust the interim compensation benchmark if we receive validated data relating to the total compensation pursuant to the 2015 AMOU contract terms that improves our understanding of that contract." Id.

In a comment to the 2018 NPRM, the AMOU registered its disappointment in learning "that the U.S. Coast Guard is again attempting to rely on [AMOU contracts] . . . as a basis to determine the 'target rate of compensation' for U.S.-registered pilots on the Great Lakes." AR 86. The union went on, however, to inform the Coast Guard that its proposal did not "accurately reflect the [AMOU] full compensation rates" as it failed to "take into account standard overtime compensation that is consistently earned by U.S. merchant mariners under [AMOU] contracts." Id. at 86–87. As a result, the AMOU urged the Coast Guard to add $21,625, the average yearly

overtime that an AMOU first mate earned in 2018, to the proposed annual compensation benchmark for Great Lakes pilots. Id. The AMOU also noted that it "has no direct financial interest in the Great Lakes Pilotage Rates," but merely wanted the Coast Guard to "accurately portray" the union's contracts. Id. at 86. In response to the AMOU's comment, certain pilotage associations expressed their understanding that this overtime figure "represents a guaranteed payment for an average of 40 hours per month or more, for overtime work (including clerical work) that is expected and intended each mate will perform." AR 97–98.

In the 2018 Final Rule, the Coast Guard adopted the AMOU's recommendation to include overtime compensation in its benchmark. The agency explained that its goal was to base "target compensation on the actual compensation of mates under the [AMOU] contract." 2018 Final Rule, 83 Fed. Reg. at 26,169. It therefore felt it "appropriate to include the guaranteed overtime in the daily aggregate rates" given that this "standard overtime compensation" was simply another "part of the [AMOU]-negotiated compensation package." Id. Although the Coast Guard indicated that it would have preferred to incorporate this information into the benchmark earlier, at the NPRM stage, it felt it could not "now ignore highly relevant information simply because it was not apparent at the beginning of the rulemaking process." Id. To do so, the agency reasoned, would likely run afoul of Judge Chutkan's ruling on the 2013 ratemaking, which had found the Coast Guard's decision "to continue using data the source of which affirmatively stated was inaccurate" to be arbitrary and capricious. St. Lawrence Seaway Pilots Ass'n, 85 F. Supp. 3d at 207 (striking down the 2014 ratemaking because the Coast Guard excluded AMOU compensation related to "holidays, weekends, and the season bonus"); 2018 Final Rule, 83 Fed. Reg. at 26,169 ("[T]he Coast Guard has been criticized for not using [AMOU] data provided during the course of the rulemaking process in the past." (citing St.

Lawrence Seaway Pilots Ass'n, 85 F. Supp. 3d at 207)).  Accordingly, the Coast Guard decided

to use the 2018 overtime compensation provided by the AMOU, adjust that figure back to the

2015 AMOU rate (using the pay increases contemplated by the AMOU contract), and then adjust

the 2015 overtime rate forward for inflation—as it had done with the rest of the AMOU

compensation data.  2018 Final Rule, 83 Fed. Reg. at 26,169.

Plaintiffs contend that the Coast Guard's decision to adopt the AMOU's suggestion to

include overtime compensation in target pilot compensation was erroneous in several respects.

First, they argue that the Coast Guard violated the APA by relying on AMOU data that it had not

verified.  Relatedly, Plaintiffs maintain that reliance on AMOU first mates' overtime

compensation was unjustified because there was no information in the record showing that the

day-to-day functions of AMOU first mates are comparable to those of Great Lakes pilots.

Plaintiffs' first argument runs aground because an agency is permitted to rely on data

submitted by commenters without verification when such data is uniquely within the

commenters' expertise.  See Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC, 737 F.2d 1095,

1124 (D.C. Cir. 1984) (holding that where it would "be impossible to conduct elaborate

independent verification proceedings on each factual comment submitted to the agency and still

conclude the proceeding within a reasonable period" an agency's decision to "rely on the

comments of the state commissions" regarding a factual detail within the commenters' expertise

"was a reasonable response").  Here, it would be incongruous to require empirical analysis of the

AMOU overtime data given that the Coast Guard has not independently verified the rest of the

AMOU contract data.  See 2018 NPRM, 83 Fed. Reg. at 2,588 (explaining that the AMOU data

"is not broken down into specific costs," but that the Coast Guard nonetheless "believe[d] that

the data points provided are generally accurate").  Plaintiffs have not offered any argument for

why overtime compensation data should be treated differently. Nor have they challenged the agency's failure to independently verify the rest of the AMOU data. Moreover, the Coast Guard's reliance is particularly reasonable in light of the fact that the AMOU has no apparent financial interest—at least directly—in the rate that pilots are paid and none of the commenters otherwise objected to the accuracy of the AMOU figures that were disclosed in the NPRM.

Turning to whether the Coast Guard reasonably justified its decision to include AMOU overtime compensation data in the compensation benchmark, the Court finds that the record amply supports the agency's decision. As the agency explained in the Final Rule, it included the overtime compensation information because it had chosen to base "target compensation on the actual compensation of mates under the [AMOU] contract." 2018 Final Rule, 83 Fed. Reg. at 26,169. Thus, because overtime compensation was simply a constituent part of compensation under that contract, the Coast Guard reasonably decided to include it in its calculation. Having been informed by the AMOU that the information it was relying upon was inaccurate, the agency reasonably concluded that it could not "now ignore highly relevant information simply because it was not apparent at the beginning of the rulemaking process," especially in light of Judge Chutkan's opinion in St. Lawrence Seaway Pilots Ass'n, 85 F. Supp. 3d at 20.

Plaintiffs mischaracterize the function of the benchmark in contending that the Coast Guard should have conducted a point-by-point pay comparison between AMOU first mates and Great Lakes pilots. The Coast Guard did not seek to apply the AMOU contract as if the pilots were mates. Rather, its goal was to base "target compensation on the actual compensation of mates under the [AMOU] contract," regardless of which category the AMOU compensation fell into. 2018 Final Rule, 83 Fed. Reg. at 26,169. Said otherwise, the Coast Guard uses the benchmark in order to compare the pilots' overall compensation to AMOU mates' overall

compensation. Whether the mates and the pilots perform the same exact functions is irrelevant. It is likewise immaterial that the AMOU negotiated this overtime rate while the pilots' rate is not subject to negotiation.[6]

In refuting Plaintiffs' argument that a point-by-point pay comparison was necessary, the Coast Guard stated that its intent in establishing a benchmark "was for a Great Lakes pilot to earn about 1.5 times the salary of an [AMOU] first mate, not to conduct a detailed comparison of pay element by element." Gov't Mot. for Summary J. at 11. Latching onto this statement, Plaintiffs complain that the goal of paying pilots "about 1.5 times the salary of an AMOU first mate" is a post-hoc justification for including the overtime compensation data in the compensation benchmark or, alternatively, an unacknowledged policy change. Pls.' Reply at 8.

Both arguments miss the mark. First, the "1.5 times" objective is not a post-hoc justification. In the Final Rule, the Coast Guard explained that it decided to use AMOU first mate data as the pilot compensation benchmark because such data "provides a highly relevant gauge for how much experienced mariners working on the Great Lakes are compensated." 2018 Final Rule, 83 Fed. Reg. at 26,168. The Coast Guard went on to explain that "the compensation of U.S. masters on Great Lakes ships provides a useful proxy for the compensation of U.S. pilots on Great Lakes ships," and therefore that the interim benchmark methodology sought to "translate the [AMOU] figure" for first *mates* into the compensation for AMOU *masters*, who earn significantly more than mates. Id. Said otherwise, the Final Rule stated that "[t]he interim

_____

[6] Plaintiffs press a related linguistic quibble. They argue that because the Coast Guard described this overtime compensation as "guaranteed" while the AMOU described it simply as "standard," the Coast Guard somehow misunderstood the AMOU's comment. But the Court reads the Coast Guard's description of this overtime compensation as "guaranteed" simply to mean that overtime is an actual and recurring part of AMOU compensation, as the AMOU itself stated.

benchmark is based on the idea that a Great Lakes pilot should earn, on average, about 1.5 times the salary of a first mate . . . ." Id. at 26,168–69. Thus, as explained in the Coast Guard's brief, the Final Rule referenced the "1.5 times" objective simply to illustrate the general purpose: as a "gauge for how much experienced mariners working on the Great Lakes are compensated," id. at 26,168—not to make a point-by-point task comparison between mates and Great Lakes pilots. Although this exact "1.5 times" quote appeared in the Final Rule section on AMOU compensation data in general, the Court discerns that this same rationale applies equally to the Coast Guard's overtime compensation, which—as explained above—is merely a subset of AMOU compensation.

Before turning to whether the "1.5 times" objective is an unacknowledged policy change, it is important to make clear that the Coast Guard did not multiply the AMOU first mate data by 1.5 to arrive at the pilot benchmark figure. Rather, as the Court sees it, the Coast Guard mentioned this objective in passing, as a back-of-the-envelope validation of its ultimate benchmark calculation, which was, as described previously, rigorously calculated using the terms of the AMOU 2015 contract. In other words, the goal that Great Lakes pilots should earn "on average, about 1.5 times the salary of a first mate" did not actually affect the Coast Guard's ten-step process for calculating the pilotage rates.

In any case, the "1.5 times" goal does not appear to be an unacknowledged policy change, although explaining why that is so requires wading through numerous previous ratemakings. As Plaintiffs correctly note, in 2014, the Coast Guard intended for target pilot compensation to "approximate[] the average annual compensation for first mates on U.S. Great Lakes vessels" in "undesignated waters," and to "approximate[] the wages of masters, not first mates," in designated waters. St. Lawrence Seaway Pilots Ass'n, Inc., 85 F. Supp. 3d at 204 &

n.10 (quoting 46 C.F.R. § 404 App. A.). But in 2016, as part of the Coast Guard's overhaul of its ratemaking methodology, the agency explicitly abandoned this prior approach and began calculating "a single individual target compensation figure" for both designated and undesignated waters. 2018 NPRM, 83 Fed. Reg. at 2,589 (explaining that prior to 2016, when the Coast Guard began calculating a single rate, "the Coast Guard calculated separate compensation figures for designated and undesignated waters—compensating pilots assigned to designated waters an equivalent rate to masters, while compensating pilots assigned to undesignated waters the equivalent rate of AMOU mates, who are paid considerably less"). At the same time, the Coast Guard abandoned its prior practice of using AMOU data, switching to the Canadian benchmark. 2016 NPRM, 80 Fed. Reg. at 54,497. The animating purpose of these significant policy changes was, in part, to increase pilot compensation in order to remedy problems in "recruiting and retaining adequately qualified pilots." Id. at 54,486. The upshot is that in 2018, the Coast Guard explained that it planned to continue calculating a "single wage rate"—which it had previously acknowledged as a change of policy in 2016, 2018 NPRM, 83 Fed. Reg. at 2,588; to base that rate on "AMOU aggregate data [for first mate] wages in designated waters"—which the 2018 NPRM explicitly acknowledged was a change from using the Canadian benchmark, id.; and to continue to aim to compensate pilots at a rate high enough to be competitive—which the Coast Guard acknowledged in 2016 necessitated a higher wage than the pilots had earned under the methodology used from 1995–2015, id.; 2016 Final Rule, 81 Fed. Reg. 11,908 ("The rate changes will also help recruit and retain pilots . . . .").[7]

---

[7] The Court further notes that it is well established that mates earn less than masters, and, unlike masters and pilots, are not licensed. See 2016 Final Rule, 81 Fed. Reg. at 11,914 (explaining that masters' and mates' "duties and responsibilities are substantially different from those of a U.S. Great Lakes pilot" and that mates earn "lower wage[s]" as they "do not hold the

To be sure, the agency did not explicitly mention the notion that pilots should earn 1.5 times the wage of an AMOU first mate in the 2018 NPRM. To the extent the Coast Guard erred by failing to formulate this idea in those precise terms in the NPRM, any error was harmless. See PDK Labs. Inc. v. U.S. D.E.A., 362 F.3d 786, 799 (D.C. Cir. 2004) ("If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration."); see also Ozark Auto. Distrib., Inc. v. Nat'l Labor Relations Bd., 779 F.3d 576, 582–83 (D.C. Cir. 2015) (collecting cases). As explained above, the notion that pilots should earn, on average, about 1.5 times what an AMOU first mate earns did not affect the Coast Guard's calculation of the pilot compensation benchmark, but was merely a bottom-line check on the Coast Guard's otherwise transparent tabulations. Thus, Plaintiffs have failed to identify any prejudice resulting from this alleged error. See City of Waukesha v. E.P.A., 320 F.3d 228, 246 (D.C. Cir. 2003) ("In making such a showing in the context of a violation of notice-and-comment requirements, petitioners may be required to demonstrate that, had proper notice been provided, they would have submitted additional, different comments that could have invalidated the rationale for the revised rule."). The Coast Guard's error, assuming there was one, was therefore a "technical failure" to meticulously follow every aspect of notice-and-comment rulemaking, as opposed to an "an utter failure to comply with notice and comment." Sugar Cane Growers Co-op. of Fla. v. Veneman, 289 F.3d 89, 96 (D.C. Cir. 2002); see Mid Continent Nail Corp. v. United States, 846 F.3d 1364, 1383 (Fed. Cir. 2017) (explaining

_____

same licenses as masters and pilots"). Moreover, although the present administrative record does not discuss this fact, in previous ratemakings, Plaintiffs acknowledge that the Coast Guard has defined an AMOU master's salary as "1.5 times mate salary, plus mate benefits." Seaway Regulations and Rules: Great Lakes Pilotage Rates, 62 Fed. Reg. 5,917, 5,920 (Feb. 10, 1997)); see also Great Lakes Pilotage Rates, 66 Fed. Reg. 36,484, 36,487 (July 12, 2001) (same).

that an agency rulemaking violates the APA when there is a "total absence of notice-and-comment rulemaking and the resulting thin or nonexistent record make it difficult for a reviewing court to conclude with certainty that no prejudice has ensued").

Last, Plaintiffs maintain that they had insufficient notice that the benchmark pilot compensation would include AMOU overtime pay. In order to comply with the APA's notice requirement, "[a]n agency's final rule need only be a 'logical outgrowth' of its notice." Covad Commc'ns Co. v. FCC, 450 F.3d 528, 548 (D.C. Cir. 2006). A final rule satisfies the "logical outgrowth" test if an interested party would have had "fair notice" of the agency's anticipated action. Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin., 494 F.3d 188, 209 (D.C. Cir. 2007).

Here, the NPRM explicitly stated that the Coast Guard "may adjust the interim compensation benchmark if [it] receive[s] validated data relating to the total compensation pursuant to the 2015 AMOU contract terms that improves our understanding of that contract." 83 Fed. Reg. at 2,588. After receiving such data from the AMOU, the Coast Guard reasonably adjusted its target pilot compensation figure, which was a "logical outgrowth" of its noticed intent to use AMOU compensation as its benchmark. Covad, 450 F.3d at 548. Plaintiffs do not challenge the Coast Guard's decision to rely on AMOU data in general, but only its decision to include overtime compensation. Because the Coast Guard reasonably decided to rely on AMOU data—a practice that it had followed for over twenty years—it rationally chose to use all parts of that compensation and Plaintiffs had "fair notice" of the agency's final course of action. Owner-Operator Indep. Drivers Ass'n, Inc., 494 F.3d at 209.

B.  The 270-Day Multiplier

The Plaintiffs next challenge the Coast Guard's assumption that Great Lakes pilots work 270 days a season.  As explained above, at Step 4 of the Coast Guard's methodology, it calculated the target yearly pilot compensation benchmark by first determining a daily aggregate wage (based on AMOU first mate data) and then multiplying that value by 270, the number of days in the shipping season.  Having used this 270-day multiplier since 2014, the Coast Guard proposed in the 2018 NPRM to continue that practice.  2018 NPRM, 83 Fed. Reg. at 2,588–89 (citing Great Lakes Pilotage Rates—2014 Annual Review and Adjustment, notice of proposed rulemaking, 78 Fed. Reg. 48,374, 48,381 (August 8, 2013)).

Plaintiffs criticized this decision in their comments to the NPRM.  While acknowledging that the Coast Guard had used the 270-day figure in past ratemakings, they contended that continuing to do so was unreasonable because in 2016 the Coast Guard "imposed mandatory rest periods on pilots that limit their working days each month and has imposed on rate payers additional costs attributable to increased staffing levels that are, in large part, attributable to mandatory rest periods."  AR 80 n.7.  Instead, Plaintiffs suggested a 200-day multiplier, arguing that AMOU compensation figures are based on days worked (by AMOU first mates) and Great Lakes pilots are only expected to work 200 days each season.  Id.  In other words, Plaintiffs maintained that because the benchmark already included the costs of the ten-day rest periods, it would result in unreasonable double counting for the Coast Guard to also include the ten-day rest periods as normal working days.

Responding to these comments, the Coast Guard began by noting "that the industry commenters have mischaracterized the 10 days of rest that [the Coast Guard has] incorporated into the staffing model."  2018 Final Rule, 83 Fed. Reg. at 26,170.  "Unlike Canadian pilots,

[AMOU] mates, or other U.S. pilots," the Coast Guard explained, "United States registered pilots *do not have guaranteed days off during the shipping season*." Id. (emphasis added).  Rather, "Great Lakes pilots are expected to be on call and available for work each day during the entire 270-day season." Id.  The Coast Guard acknowledged its goal of allowing pilots ten days rest when pilot demand is not "at its highest level (during the 7 months that are not the opening or closing of the season)," and it explained that pursuing that goal had led it to "set the number of pilots so that there are approximately 1/3 more pilots than necessary to handle traffic during these times." Id.  But it stressed that the ten-day rest periods are not mandatory or guaranteed.  Rather, the Coast Guard selected the 270-day work day assumption simply "to *maximize the likelihood* for providing the full 10 [rest] days per month." Id. at 26,170–71 (quoting 2016 NPRM, 80 Fed. Reg. at 54,490); see 2016 Final Rule, 81 Fed. Reg. at 11,922 (noting the Coast Guard's belief that these higher staffing levels were "essential if [it] [was] to provide the recuperative monthly rest periods recommended by the [National Transportation Safety Board] in the interests of safety").[8]

Second, the Coast Guard explained that if it were to adopt Plaintiffs' suggestion of using a 200-day multiplier, pilots would effectively "receive zero compensation for being 'on call' during those additional 70 days of the season." 2018 Final Rule, 83 Fed. Reg. at 26,171.  While the Coast Guard acknowledged that "multiplying the aggregate daily wage by 270 means that Great Lakes pilots would receive full compensation for days on call, even if the system is designed so that they are not expected to work for those days," it determined that the 270-day

---

[8] While it is merely recommended that the pilots receive ten rest days per month during non-peak months, regulations require pilots to receive at least ten hours of rest after performing pilotage services for more than ten hours.  46 C.F.R. § 401.451(a)(2).

multiplier was nevertheless the preferable option.  Id.  In the agency's view, the 270-day multiplier better served its mission of promoting safe and reliable pilotage because it increases pilot compensation, which in turn increases the likelihood that the Coast Guard is able to attract a sufficient number of experienced pilots.  Id.  While the Coast Guard also aims to ensure efficient pilotage, which would favor using a 200-day rate, it determined that promoting safe and reliable pilotage were more compelling interests, particularly given that the 270-day multiplier resulted in a target pilot compensation "within the range compensation of other U.S. pilotage associations" and that an economic analysis of the Great Lakes shipping industry revealed that "pilotage costs remain low enough to enable a robust trade of commodities."  Id.

Lastly, the Coast Guard noted that cruise ships, some of which are required to employ Great Lakes pilots, were becoming "an increasingly important source of business on the Great Lakes."  Id.  Unlike vessels carrying commercial wares, the Coast Guard explained, cruise ships are not able to tolerate schedule delays caused by a lack of available pilots.  The agency thus identified a particularly pressing need to ensure an adequate number of reliable and experienced pilots, even if those pilots came at an additional cost.  Id.

Renewing their past criticisms, Plaintiffs contend that the Coast Guard's decision to use the 270-day multiplier was arbitrary and capricious because the Coast Guard failed to "cogently explain why it had exercised its discretion in a given manner."  State Farm, 463 U.S. at 43. Relatedly, Plaintiffs argue that the use of the 270-day multiplier was arbitrary and capricious because the Coast Guard failed to investigate how often pilots were called in to work during their rest periods and thereby failed to "examine the relevant data."  Id.

However, an agency "need not—indeed cannot—base its every action upon empirical data," Chamber of Commerce of U.S. v. Sec. & Exch. Comm'n, 412 F.3d 133, 142 (D.C. Cir.

2005), but instead need only "justify its rule with a reasoned explanation," <u>Stilwell v. Office of Thrift Supervision</u>, 569 F.3d 514, 519 (D.C. Cir. 2009). Even absent empirical evidence showing how often pilots were called into work, the Coast Guard's decision to use the 270-day multiplier easily clears the low hurdle for supplying minimal standards of rationality. <u>See</u> <u>Frizelle</u>, 111 F.3d at 176. As its cogent discussion in the 2018 Final Rule demonstrates, the Coast Guard fully considered Plaintiffs' contention that using a 270-day multiplier would be more costly. But the agency concluded, rightly or wrongly, that this increase in cost was more than justified by the gains to safety and reliability, which the Coast Guard determined in its discretion were more pressing concerns. <u>See</u> <u>Pub. Employees for Envtl. Responsibility</u>, 25 F. Supp. 3d at 100 ("[A] great deal of deference is owed to the 'Coast Guard's expertise . . . in maritime safety.'") (quoting <u>Collins</u>, 351 F.3d at 1253). Having increased pilot compensation in 2016 in order to improve recruitment and retention (and thereby improve safety and reliability), the Coast Guard reasonably concluded that substantially reducing compensation by using a 200-day multiplier would run counter to its stated goals. <u>See</u> <u>Zukunft</u>, 296 F. Supp. 3d at 43 (holding that the record "amply" supported the Coast Guard's decision to base the number of pilots needed on "peak pilotage demand periods" in order to promote safe piloting on the Great Lakes by ensuring that pilots would have sufficient rest time). Plaintiffs may disagree with how the Coast Guard balanced these three competing interests, but the record does not reflect a failure to engage in reasoned decisionmaking. The Court therefore upholds the agency's use of the 270-day multiplier.

    C.  <u>The Working Capital Fund</u>

    Plaintiffs object to the Coast Guard's inclusion of working capital in the agency's ratemaking methodology. As noted above, Step 5 of the 2018 ratemaking process involved

calculating the shippers' contribution to a "working capital fund"—which is designed to provide the pilot associations with money to fund infrastructure improvement projects. Past ratemakings had included a step called "return on investment" to achieve a similar purpose. Historically, the Coast Guard had also imposed periodic surcharges to fund particular capital projects as well as pilot training. 2018 Final Rule, 83 Fed. Reg. at 26,172. In the 2017 NPRM, the Coast Guard renamed this step the "working capital fund" and explained that it was intended to "provide the pilots with working capital for future expenses associated with capital improvements, technology investments, and future training needs, with the goal of eliminating the need for surcharges." Great Lakes Pilotage Rates—2017 Annual Review, 81 Fed. Reg. 72,011, 72,017 (Oct. 19, 2016) ("2017 NPRM"). The 2017 Final Rule further explained that the fund "is structured so that the pilot associations can demonstrate credit worthiness when seeking funds from a financial institution for needed infrastructure projects, and those projects can produce a return on investment at a rate commensurate to repay a financial institution." Great Lakes Pilotage Rates—2017 Annual Review, 82 Fed. Reg. 41,466, 41,484 (Aug. 31, 2017). In the 2018 NPRM, the Coast Guard again proposed including the working capital fund as part of the rate calculation.

In their comments, Plaintiffs urged the Coast Guard to eliminate the working capital fund altogether—or at least to issue regulations limiting its use—in order to prevent pilot associations from using the fund as a source of additional pilot compensation. AR 81. They argued that the working capital fund "bears no clear relationship to its supposed function or nomenclature" and that it was simply a "sweetener" meant to drive up compensation rates. Id. Plaintiffs also noted that the working capital fund was intended to eliminate the need for surcharges, yet the Coast Guard had continued to impose yearly surcharges for pilot training. Id.

In the Final Rule, the Coast Guard chose not to eliminate the working capital fund from the ratemaking process, or to modify its calculation. The Rule reiterated the agency's past explanations of the fund. 2018 Final Rule, 83 Fed. Reg. at 26,172–73. With regard to the calculation method, the Coast Guard explained that "[b]ecause the purpose of the working capital fund is that the pilot associations can demonstrate credit worthiness when seeking funds from a financial institution for needed infrastructure projects, the value of the working capital fund contribution is tied to pilot association revenue and prevailing corporate interest rate." Id. at 26,173. The Coast Guard further noted that the working capital fund was implemented in order to avoid imposing surcharges to shippers for financing infrastructure projects and that since its implementation in 2016, the Coast Guard had only imposed surcharges for pilot training. Id. Responding to Plaintiffs' suggestion that the Coast Guard promulgate regulations regarding the pilotage associations' use of the funds, the agency acknowledged that "there may be merit in a mechanism to ensure that the funds are set aside for future projects." Id. at 26,172. But it determined that it would not incorporate that suggestion "into the 2018 ratemaking procedure at this late stage." Id. The Final Rule nonetheless reaffirmed that the money allocated to the working capital fund "is meant to secure the financing for infrastructure improvements, and should not be used as compensation." Id. at 26,173. Approximately six months after the final rule was published, the Coast Guard issued a guidance letter concerning the proper use of working capital funds. U.S. Coast Guard, Guidance Letter (Nov. 30, 2019).[9]

Plaintiffs renew their criticisms of the working capital fund in their briefing, complaining that the Coast Guard violated its obligation to engage in reasoned decisionmaking when it

_____

[9] https://www.regulations.gov/document?D=USCG-2018-0665-0011.

implemented the fund and that it failed to meaningfully respond to their comments. Plaintiffs take issue with the Coast Guard's observation that the Plaintiffs did not propose an alternative way to value the fund, noting that it is the agency, not Plaintiffs, that is obligated to supply reasoned decisionmaking. And while applauding the Coast Guard's subsequent issuance of guidance on the use of the fund, Plaintiffs argue that the guidance is a subsequent development that the Court may not consider in assessing whether the Coast Guard acted reasonably in light of the record that was before the agency when the Final Rule was issued.

The Court concludes that the Coast Guard's decision to continue to include the working capital fund as part of the ratemaking process was adequately supported in the Final Rule and that the Rule meaningfully responded to Plaintiffs' comments. As the Rule explains, the fund is meant to provide the associations with capital—in addition to the money needed to cover its standard operating expenses and pilot compensation—to fund infrastructure and technology improvement projects. Providing a mechanism for such funding falls within the Coast Guard's broad responsibility to set rates in light of the "public interest and the costs of providing [pilotage] services." 46 U.S.C. § 9303(f). Keeping ships in good repair and equipped with updated technology is surely in the public interest. And tying the amount of the fund to the associations' operating and compensation expenses takes into account the cost of providing pilotage services. As for the mechanism chosen, there are at least two alternative ways of securing the funding within the ratemaking framework. Previously, the Coast Guard imposed surcharges that the shippers had to pay for particular projects. In 2016, as the Rule indicates, the agency decided to establish the fund "with the goal of eliminating the need for surcharges." 2017 NPRM, 81 Fed. Reg. at 72,017. While the Coast Guard acknowledges that it has continued to impose surcharges for pilot training, it has not done so for infrastructure improvements or

maintenance.  2018 Final Rule, 83 Fed. Reg. at 26,173.  Plaintiffs may prefer the surcharge regime, but creation of the fund is certainly a rational alternative to past practice.

The Final Rule also adequately explains how the amount of the fund is calculated.  The Court (and Plaintiffs) can readily discern the concept.  Associations may choose to obtain bank financing for capital improvement projects.  In order to qualify for such a loan, an association would have to "demonstrate credit worthiness."  Id.  In other words, it would have to show the bank that it has sufficient cash flow—on top of its recurring operating expenses, compensation to pilots, and other current liabilities—to make the interest payments on the loan.  The Coast Guard selected a benchmark corporate bond interest rate to generate the incremental revenue that the association would need in order to make a hypothetical loan payment and therefore qualify for the loan in the first instance.  And it indicated that such finance payments would not be permitted as an operating expense.  Id. (The Coast Guard "would expect the working capital funds to be used to finance those loans [for capital improvements]," and so "would not permit the financing expenses to be counted as operating expenses.").  That explanation is sufficient and perfectly reasonable.

Finally, the Coast Guard cannot fairly be faulted for its response to Plaintiffs' comments about the fund being used for back-door compensation payments.  The agency acknowledged the merit of the concerns, directly responded to them by emphasizing that the fund cannot be used for compensation, and committed to study the matter further outside the context of the annual ratemaking process.  Id. (explaining that the money collected as part of the working capital fund "is meant to secure the financing for infrastructure improvements, and should not be used as compensation," but noting that it would take the idea of "implement[ing] some limitations on the use of working capital fund money . . . under advisement").  Again, the agency's response was

sufficient.  See Pub. Citizen, 988 F.2d at 197.  That the Coast Guard followed up by issuing the

very guidance that Plaintiffs sought only bolsters the conclusion that the agency meaningfully

considered the comments in the Final Rule.

     D.  The 10-Year Traffic Volume Average

     Plaintiffs next assert that the Coast Guard erred by using a ten-year rolling average of

actual pilot work hours to estimate "traffic" in the upcoming season.  Again, at Step 7 of the

ratemaking, the Coast Guard calculates the pilots' base hourly rate.  It does so by dividing the

total projected revenue needed as determined at Step 6, by the average "traffic" in both

designated and undesignated waters—as represented by the actual number of hours pilots worked

in prior years.  Consistent with previous ratemakings, the Coast Guard proposed using a trailing

ten-year average in its 2018 NPRM.[10]

     During the comment period, Plaintiffs suggested that using a ten-year traffic average was

inappropriate because it included data from 2008–2013, during which they claimed average

traffic fell significantly as a result of the Great Recession.  AR 82.  Including this data in the

calculation of the average, Plaintiffs complained, would cause the 2018 proposed hourly rates "to

overshoot target revenue requirements by more than 10% across all pilotage districts."  Id.

Plaintiffs suggested instead that the Coast Guard use a three-year average because "it [is] rational

to assume that 2018 hours will be generally comparable to levels in the 2014–2017 period."  Id.

Further, Plaintiffs contended that using a three-year average would be more consistent with the

time frames used in other aspects of the Coast Guard's ratemaking, such as its calculation of

_____

    [10] In the 2016 Final Rule, the Coast Guard calculated the average traffic flow using "data
from the previous nine full shipping seasons from 2007 to 2015," and stated that "[b]y the 2018
ratemaking, we will have 10 year's data, and thereafter we will use the most recent 10 seasons
for our base period."  81 Fed. Reg. at 11,934.

operating expenses, which are based on three-year-old data, and staffing levels, which are based on current-year data.  Id.  According to Plaintiffs, following their suggestion "would result in substantially lower shipping costs, as the total revenue needed . . . would be divided by 51,607 hours of traffic, rather than the 43,384 hours of traffic using the 10-year average."  2018 Final Rule, 83 Fed. Reg. at 26,173.

The Coast Guard rejected this suggestion.  Though it acknowledged that hourly pilotage rates would be lower if the Coast Guard used a three-year average, the agency declined to do so because "traffic volumes on the Great Lakes can vary significantly from year to year, and a 10-year average is a good way to smooth out variations in traffic caused by global economic conditions."  Id.  Assuming a normal distribution of traffic, it continued, "approximately 5 years out of every 10 will have traffic above the 10-year average level, and approximately 5 will have traffic below it."  Id.  Thus, though "in 2018, this number may underestimate traffic, . . . in some years, the use of the 10-year average overestimated traffic."  Id.  Responding to its use of shorter windows for other estimates in the ratemaking process, the Coast Guard explained that "[u]nlike operating expenses, which do not have wide swings from year to year, and pilot staffing levels, which can be determined with a high degree of precision, traffic averages are the hardest part of the ratemaking inputs to predict."  Id.  Believing it was in the public interest to prevent "dramatic swings" in rates from year to year, the Coast Guard "decided to continue using the 10-year average in [its] calculations."  Id.

Plaintiffs argue that the Coast Guard's response to their comments was insufficient.  But an agency's obligation to address specific comments is not "particularly demanding."  Pub. Citizen, 988 F.2d at 197.  Rather, "[t]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not 'based on a consideration of the

relevant factors.'"  Thompson, 741 F.2d at 409 (quoting Citizens to Preserve Overton Park, 401 U.S. at 416).

Here, the Coast Guard satisfied its obligation of responding to Plaintiffs' comments in a way that shows that it considered relevant factors.  As the Rule explains, the Coast Guard made an intentional choice to use a wider window for calculating the traffic average in order to minimize volatility.  Although the agency acknowledged that using a ten-year moving average meant that in 2018, Plaintiffs would have to pay more than they would have had the Coast Guard used a three-year moving average, the agency determined that the ten-year average was nonetheless preferable in order to smooth out historically observed spikes in traffic data.  That was a rational choice, even if the traffic data included data from the period of the last recession.

Moreover, as the Defendants highlighted in their briefs, the data from the 2008–2013 period was not as clear-cut as Plaintiffs contend.   To illustrate, the record shows that "[a]lthough demand fell after 2008 in every district in both designated and undesignated waters, each of the three districts saw a significant spike in traffic during 2010 . . . ."  Gov't Mot. for Summary J. at 12 (explaining that in 2010, District One's traffic increased 37.8%, District Two's traffic increased 64.3% in undesignated waters and 73.5% in designated waters, and District Three's traffic increased 61.4% in undesignated waters and 35% in designated waters); see also 2018 Final Rule, 83 Fed. Reg at 26,182 (Tables 23-25).  Similarly, the record shows that traffic was "up 43% in 2014 and down 15.4% in 2015" and that "changes in volume of more than 10% from the prior year" occurred seven of the ten years used in the average.  Def. Int. Mot. for Summary J. at 12 (citing 2018 Final Rule, 83 Fed. Reg at 26,182 (Tables 23-25)).  These data clearly support the Coast Guard's decision to use a ten-year moving average in order to prevent "dramatic swings" in rates from year to year.  2018 Final Rule, 83 Fed. Reg. at 26,173.

E.  The Overcollection of Revenue

Lastly, Plaintiffs criticize the Coast Guard's failure to address the over-realization of revenue in recent years.  The Coast Guard's overall ratemaking methodology seeks to establish pilotage rates (based on an estimated amount of traffic) that will allow the pilots to recoup enough revenue to cover their operating expenses, pilot compensation, and working capital.  But the amount of revenue needed is simply a projection.  When one or more of the Coast Guard's assumptions does not bear out in the relevant season, causing the agency to set pilotage rates too high, the actual revenue that the pilot associations collect exceeds the Coast Guard's projected revenue.  In such instances, the pilots benefit from the miscalculation and are not required to return the excess revenue they collect to the shippers.  Conversely, when erroneous assumptions cause the agency to set pilotage rates too low, the actual revenue is less than the projected revenue.  In that case, the shippers receive a windfall, as they are not obligated to pay the difference in revenue to the pilots.

Plaintiffs indicate that since 2015, the actual revenue collected by the associations has exceeded projected revenue by significant sums.[11]  And they complain that the Coast Guard's ratemaking methodology has failed to adequately respond to comments highlighting that for the past several years the rates set by the Coast Guard have resulted in the overcollection of revenue.

Although it appears that Plaintiffs have abandoned this claim by failing to contest the points raised by the Pilots and the Coast Guard in their papers, Plaintiffs' argument fails on the

---

[11] Plaintiffs provide tables showing actual revenue as compared to projected revenue in their opening brief but neglect to cite the source of those numbers.  Pls. Mot. for Summary J. at 26.  The Court assumes these figures are accurate and surmises that they come from the Great Lakes Pilotage Management System, a system that "tracks data related to managing and coordinating the dispatch of pilots on the Great Lakes, and billing in accordance with the services."  2018 Final Rule, 83 Fed. Reg. at 26,188.

merits in any event.  In the 2018 Final Rule, the Coast Guard explained at length that the past "over-realization of revenues was caused by two factors, as the industry commenters note in their remarks:  The lack of incorporation of weighting factor fees into the ratemaking methodology (revised per the suggestion of industry commenters), and a traffic level higher than the 10-year average."  2018 Final Rule, 83 Fed. Reg. at 26,175.  Given that the Coast Guard now incorporates weighting factors (Step 8), one of the main drivers of overcollection has been addressed.

The Coast Guard further explained it viewed the higher-than-expected revenue that resulted from using the ten-year traffic average as a feature of the methodology, not a bug.  Id. When the shippers use more pilot services than expected, they pay more for those services. Conversely, when the shippers use a lower-than-expected amount of pilotage services, they are not obligated to pay for services they did not use.  Further, as the Coast Guard explained in the Final Rule, it had considered the effects of overcollection of revenue, but determined that overcollection was not a particularly pressing problem.  It noted that it had commissioned a study on the effects of increased costs to shippers, and that study had concluded that "although pilotage rates have by necessity increased substantially (given [the Coast Guard's] focus on increasing the number of pilots and their compensation to encourage recruitment and retention), they have not increased to levels that threaten the economic viability of Great Lakes shipping."  2018 Final Rule, 83 Fed. Reg. at 26,175.  Said otherwise, the Coast Guard evaluated the concern that overcollection of revenue was harming Plaintiffs, but concluded that the harm, if any, was not substantial, and in any case was outweighed by the harms that under-realization of revenue would have on pilot recruitment and retention.  The Coast Guard's response to Plaintiffs' comments was sufficient to satisfy its obligations under the APA.  The Court's conclusion is

further bolstered by Judge Contreras's holding that the Coast Guard is under no obligation to "true up" projected and actual revenues generated by the rates. <u>Zukunft</u>, 296 F.3d at 54 (noting that the shippers had failed to "point to any instance in which the Coast Guard had previously reduced rates based on prior over-collections").[12]

## IV. Conclusion

For the foregoing reasons, the Court will deny Plaintiffs' Motion for Summary Judgment and grant Defendants' and Defendant-Intervenors' Motions for Summary Judgment. A separate Order accompanies this opinion.

---

[12] Plaintiffs also complain in passing that the increase in rates caused by the challenged provisions violates a memorandum of understanding ("MOU") between the Coast Guard and the Canadian Great Lakes Pilots Association, under which the parties expressed their "inten[t] to arrange for the establishment of regulations imposing comparable rates and charges." Memorandum of Understanding from the U.S. Coast Guard and the Great Lakes Pilotage Auth. on Great Lakes Pilotage (Sept. 19, 2013), https://www.uscg.mil/hq/cg5/cg552/docs/2013 %20MOU%20English.PDF. Plaintiffs charge the Coast Guard with violating this MOU by imposing rates for American pilots that are significantly higher than those charged for Canadian pilots. This argument fails for a few reasons. First, on its face, the MOU did not obligate the Coast Guard to set rates that mirror Canadian rates. Rather, it merely established that the parties "*intend[ed]* to arrange for the establishment of regulations imposing comparable rates and charges." The legal and practical effect of this aspirational language is far from clear. Second, the MOU cannot supersede the Great Lakes Pilotage Act of 1960, which requires the Coast Guard to set rates in "consideration to the public interest and the costs of providing the services." 46 U.S.C. § 9303(f). As the D.C. Circuit has explained, there is plainly a strong public interest in maintaining safe pilotage. <u>See Menkes v. U.S. Dep't of Homeland Sec.</u>, 637 F.3d 319, 334 (D.C. Cir. 2011) ("The legislative history of the GLPA indicates the factors at issue in regulating Great Lakes pilotage—including the need for maritime safety . . . ."). Thus, the Coast Guard had no authority to override its safety determination in order to ensure that American pilots' rates were "comparable" to the Canadian rates, MOU or no. Rather, the Act requires it to set rates at a level that would further the public interest in safety.

35

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>March 10, 2020</u>